IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                Plaintiff,

     vs.                  **Case No. 00-40104-01/02-RDR**

WILLIAM LEONARD PICKARD
and CLYDE APPERSON,

                Defendants.

_____

<u>**MEMORANDUM AND ORDER**</u>

This matter is presently before the court upon the following motions: (1) defendant Pickard's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255; (2) defendant Apperson's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255; (3) defendants' motion for leave to conduct discovery; (4) defendants' motion to amend and correct record; (5) defendants' motion for enlargement of time to delay ruling to conduct discovery; (6) defendants' motion to produce OCDETF proposal; and (7) defendants' motion for ruling. Having carefully considered the arguments of the parties, the court is prepared to rule on all of these motions.

The defendants were originally indicted on November 8, 2000. They were initially charged with conspiracy to manufacture, distribute and dispense 10 grams or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD) in violation of 21 U.S.C. § 846. An additional charge of

possession with intent to distribute or dispense 10 grams or more of a mixture or substance containing a detectable amount of LSD in violation of 21 U.S.C. § 841(a)(1) was added on January 17, 2001.

The trial began on January 13, 2003. The trial concluded on March 28, 2003. The jury returned a verdict on March 31, 2003. The defendants were found guilty on both charges. Prior to the conclusion of the trial, defendant Pickard sought dismissal based upon outrageous government conduct and prosecutorial misconduct. The court denied this motion following a hearing and then issued a written order on April 4, 2003. United States v. Pickard, 278 F.Supp.2d 1205 (D.Kan. 2003). Both defendants subsequently filed motions for new trial. Defendant Pickard also filed a motion for judgment of acquittal. These motions were denied on July 29, 2003. United States v. Pickard, 278 F.Supp.2d 1217 (D.Kan. 2003). Defendant Pickard then filed a motion to dismiss due to unlawful electronic surveillance. On November 19, 2003, defendant Pickard filed a "supplement" to his motion for new trial regarding outrageous judicial conduct. The court denied these motions on November 20, 2003. Thereafter, the court sentenced defendant Pickard to life imprisonment on both counts to run concurrently and defendant Apperson to thirty years imprisonment on each count to run concurrently. See United States v. Pickard, 298 F.Supp.2d 1140 (D.Kan. 2003); United States v. Apperson, 298 F.Supp.2d 1149 (D.Kan. 2003).

Each defendant filed a notice of appeal. On August 3, 2004, the defendants filed a motion for new trial based upon juror misconduct. The court denied this motion on September 16, 2004. United States v. Pickard, 2004 WL 3186232 (D.Kan. 2004). Thereafter, the defendants filed notices of appeal. The Tenth Circuit affirmed this court's denial of defendants' motion for new trial on November 8, 2005. United States v. Apperson, 153 Fed.Appx. 507 (10th Cir. 2005). The Tenth Circuit then affirmed the defendants' convictions and sentences on March 28, 2006. United States v. Apperson, 441 F.3d 1162 (10th Cir. 2006), cert. denied, 549 U.S. 1117 (2007) and 549 U.S. 1150 (2007).

On January 4, 2008, the defendants filed a motion for leave to file a motion for new trial. The defendants then filed the instant § 2255 motions on January 7, 2008. The court denied the motion for leave to file a motion for new trial on February 12, 2008. The defendants filed memoranda in support of their § 2255 motions on May 13, 2008. The defendants have since filed the additional motions noted previously.

The facts of this case as set forth by the Tenth Circuit in its opinion are as follows:

In October 2000, Gordon Todd Skinner voluntarily contacted the United States Drug Enforcement Agency (DEA) and informed them he "wished to cooperate" and provide them with "information about an LSD organization." Generally speaking, Skinner told the DEA "that William Leonard Pickard and Clyde Apperson were . . . partners" in an organization that manufactured LSD and that he, Skinner, "had been part of the organization . . . and was

[at that time] in possession of the laboratory equipment," "at a decommissioned missile base near Wamego, Kansas that he owned."

Skinner proceeded to provide the DEA with more detailed information about the organization and his involvement. According to Skinner, Pickard and Apperson first established an LSD laboratory in an Aspen, Colorado residence in late 1996. Pickard, who had studied chemistry at Purdue University, served as the chemist. Apperson was responsible for setting up and dismantling the necessary laboratory equipment.

In September 1997, Pickard and Apperson moved the LSD laboratory from Aspen to a house in Santa Fe, New Mexico. Apperson assembled the laboratory at that location and Pickard proceeded to manufacture LSD there until approximately September 1999. During that time frame, Pickard obtained many of the chemicals and most of the necessary glassware from Alfred Savinelli, the owner of a business in Taos, New Mexico called "Native Scents." Pickard paid Savinelli over $300,000 from 1995 to 1999 for his help in obtaining the chemicals and glassware.

Skinner became involved with Apperson and Pickard in February 1998. Skinner assisted Pickard in laundering the cash proceeds of the conspiracy, and also played a major role in developing the covert communications scheme utilized by the conspirators. As Pickard's "money man," Skinner assisted Pickard "in the transport of money from the primary distributor to the persons whom . . . Pickard intended it to go, those being the [precursor chemical] source and other persons within the organization."

In mid to late 1999, Pickard asked Skinner "to secure a location to house the clandestine [LSD] laboratory." Id. Initially, Pickard wanted the location to be elsewhere in Santa Fe, New Mexico. Pickard subsequently directed Skinner "to find a location either in Nevada or Kansas." In September 1999, Apperson and Pickard dismantled the Santa Fe LSD laboratory and, in December 1999, moved it to an abandoned missile base near Salina, Kansas, where it was maintained by Skinner. In the fall of 2000, Skinner, apprehensive that the owners of the base were going to discover the laboratory, unilaterally decided to move it, along with a precursor chemical, to the Wamego missile base. In turn, Skinner was supposed to turn over possession of the laboratory

4

and the precursor chemical to Apperson and Pickard.

After corroborating much of the information provided by Skinner, the DEA initiated an undercover operation with Skinner on October 19, 2000. At the outset of this undercover operation, the DEA recorded various phone calls between Skinner and Pickard. On October 23, 2000, at the DEA's request, Skinner met Pickard in a hotel room in Marin County, California. During the meeting, which was videotaped by the DEA, Pickard and Skinner discussed the LSD laboratory and the idea of moving it from its Wamego location. Pickard advised Skinner that he wanted Apperson to take possession of the laboratory equipment.

On October 27, 2000, Skinner gave DEA agents a tour of the Wamego missile base. During the tour, DEA agents observed "the contents of a non-operational LSD laboratory packed in approximately [forty-five] large, green shipping containers." The DEA agents subsequently obtained and executed a search warrant for the base. Among the items seized during the search were 6.5 kilograms of a substance determined to be ergocristine, a substance used in the manufacture of LSD.

Following the search, DEA agents continued to monitor phone conversations between Skinner and Pickard. Pickard eventually told Skinner that he was coming to see the Wamego laboratory and to make sure that the ergocristine was secure. On November 2, 2000, Pickard and Apperson flew to Tulsa, Oklahoma. On November 4, 2000, Pickard and Apperson drove to Wamego in a rental car and met Skinner near the missile base.

During the meeting on November 4, 2000, Pickard and Apperson expressed to Skinner their concern about storing the laboratory equipment at the Wamego missile base. Pickard and Apperson also expressed concern about their own safety if the laboratory equipment and ergocristine were not returned to them. Ultimately, Pickard and Apperson began making plans to move the laboratory equipment and ergocristine out of the Wamego missile base.

That same day (November 4, 2000), Pickard and Apperson rented a truck in Topeka, Kansas and listed a return destination for the truck as Albuquerque, New Mexico. The pair then drove the truck to the Wamego missile base and began loading it with lab equipment. On

November 6, 2000, the ergocristine was returned by the DEA to the base, unbeknown to Pickard and Apperson. That same day, Skinner informed Pickard and Apperson where the ergocristine was located on the base. Pickard retrieved the ergocristine and left the base with it in the rental car. Apperson also left the base driving the rental truck loaded with lab equipment.

As Pickard and Apperson left the base, Kansas Highway Patrol (KHP) officers, acting at the request of the DEA, attempted to stop the rental car and truck. Pickard and Apperson, however, refused to stop and instead increased their speed. Eventually, the KHP officers forced Pickard and Apperson to stop by pulling in front of the rental truck driven by Apperson. Apperson was removed from the truck and taken into custody. Pickard fled from the scene on foot after letting the rental car roll to a stop in a ditch. Pickard was arrested the following day. The ergocristine was found in the rental car that Pickard had been driving. Also found in the rental car was a recipe for the manufacture of LSD and notes regarding what appeared to be past production quantities.

The DEA obtained search warrants for the missile base, which they executed on November 17 and 22, 2000. The execution of the warrants took several days due to the volume of materials and the danger posed by the chemical substances. During the searches, the DEA found numerous items and equipment associated with an LSD laboratory, as well as various chemical substances, including 41.3 kilograms of LSD, 97.5 kilograms of lysergic acid, and 23.6 kilograms of iso-lysergic acid. The DEA also tested a large patch of dead grass found outside one of the buildings on the base. The soil samples tested positive for LSD, iso-LSD, and lysergic acid.

Apperson, 441 F.3d at 1175-77 (citations and footnote omitted).

**MOTIONS TO VACATE, SET ASIDE OR CORRECT SENTENCES**

In the § 2255 motions, the defendants both raise the following claims: (1) the government violated their right to a speedy trial under the Speedy Trial Act; (2) the government violated its

6

Brady/Giglio obligations by suppressing the criminal and informant backgrounds of certain witnesses, including Gordon Todd Skinner; (3) the government engaged in prosecutorial misconduct by failing to disclose exculpatory evidence and by altering certain exhibits; (4) the evidence was insufficient to support their convictions; and (5) their sentences were illegal for several reasons.   Pickard raises these additional claims:   (1) the government violated his expectation of privacy in entering the premises at Wamego without a search warrant; (2) the district court erred in granting the government's motion in limine concerning Skinner; and (3) the district court erred in refusing to allow certain defense witnesses to testify and in refusing to grant immunity to proposed defense witnesses.   Apperson also contends that the court erred in denying his motion to sever.

A federal prisoner may only obtain relief under § 2255 if his sentence (1) was imposed in violation of the Constitution or federal laws, (2) was imposed by a court without jurisdiction to do so, (3) was in excess of the maximum permitted by the law, or (4) is otherwise subject to attack.   28 U.S.C. § 2255.   In order to obtain relief under § 2255 on the basis of constitutional error, the petitioner must establish an error of constitutional magnitude which had a substantial and injurious effect or influence on the verdict.   Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993).   In order to obtain relief on the basis of nonconstitutional error, the

petitioner must show a fundamental defect in the proceedings resulting in a complete miscarriage of justice or an error so egregious that it amounted to a violation of due process. Reed v. Farley, 512 U.S. 339, 353-354 (1994). If a court finds a claim under § 2255 to be valid, the court "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255.

An evidentiary hearing must be held on a § 2255 motion "unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; United States v. Galloway, 56 F.3d 1239, 1240 n. 1 (10th Cir. 1995); see also Schriro v. Landrigan, 127 S.Ct. 1933, 1940 (2007) ("It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."). To be entitled to an evidentiary hearing, the defendant must allege facts which, if proven, would entitle him to relief. See Hatch v. Oklahoma, 58 F.3d 1447, 1471 (10th Cir. 1995), cert. denied, 517 U.S. 1235 (1996). "[T]he allegations must be specific and particularized, not general or conclusory." Id. The court finds that a hearing on the defendants' motions is not necessary. The court finds, for the reasons stated in this opinion, that the materials already in the record conclusively show that the defendants are not entitled to

relief on any of their claims.

Brady/Giglio

The court shall turn immediately to the defendants' claim that the government violated its Brady/Giglio obligations by suppressing the criminal and informant backgrounds of certain witnesses, including Gordon Todd Skinner. There is little question, based upon the depth and degree of their arguments, that this is the centerpiece of their § 2255 motions. The defendants assert that the government suppressed records involving Skinner's informant activity and criminal activity in at least 21 cases. They further contend that the government suppressed numerous state and federal investigations of Skinner during the period from 1997 to 2003. The defendants further allege that the government suppressed (1) an ongoing relationship with Skinner prior to trial; (2) multiple deactivations for cause and blacklisting of Skinner; (3) Skinner's DEA "confidential informant assessment"; (4) the $1,000,000 in benefits to Skinner retained in violation of federal law; (5) reports prior to sentencing showing an investigation of Skinner's clandestine LSD/MDMA laboratory in Tulsa, Oklahoma; (6) reports showing Skinner's continuing drug manufacture and distribution during trial; and (7) investigative records and prior convictions of witnesses Savinelli and Guinan.

The Fifth Amendment provides no person shall be deprived of liberty without due process. U.S. Const. amend. V. In Brady v.

9

Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held the government's suppression of evidence favorable to the accused violates due process where the evidence is material to guilt or punishment.  In Giglio v. United States, 405 U.S. 150, 154 (1972), the Supreme Court extended Brady to require the government to disclose impeachment evidence as well as exculpatory evidence.  To establish a Brady violation, a habeas petitioner must demonstrate: (1) the evidence at issue is favorable to him because it is exculpatory or impeaching; (2) the government suppressed the evidence; and (3) prejudice ensued from the suppression, i.e., the suppressed evidence was material to guilt or punishment.  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

Impeachment evidence must be material before its suppression justifies a new trial.  Wood v. Bartholomew, 516 U.S. 1, 5 (1995) (per curiam).  Evidence is material if there is a reasonable probability its disclosure would have produced a different outcome. See United States v. Bagley, 473 U.S. 667, 682 (1985).  A "reasonable probability" of a different result is shown when the government's failure to disclose evidence "undermines confidence in the outcome of the trial."  Id. at 678.  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995).

The court must evaluate the strength of the impeachment evidence and the effect of its suppression in the context of the entire record to determine its materiality. <u>Bagley</u>, 473 U.S. at 683.

The government's suppression of impeachment evidence can warrant a new trial "where the evidence is highly impeaching or when the witness' testimony is uncorroborated and essential to the conviction." <u>United States v. Martinez-Medina</u>, 279 F.3d 105, 126 (1st Cir.), <u>cert. denied</u>, 536 U.S. 932 (2002). The Supreme Court has found <u>Brady</u> violations where the government failed to disclose impeachment evidence that could have been used to impugn the credibility of the government's "key witness," <u>see</u> <u>Giglio</u>, 405 U.S. at 154-55, or that could have "significantly weakened" key eyewitness testimony. <u>Kyles</u>, 514 U.S. at 441. Suppressed evidence is immaterial under <u>Brady</u>, however, if the evidence is cumulative or impeaches on a collateral issue. <u>United States v. Page</u>, 808 F.2d 723, 730 (10th Cir.), <u>cert. denied</u>, 482 U.S. 918 (1987). Suppressed impeachment evidence, if cumulative of similar impeachment evidence used at trial (or available to the petitioner but not used) is superfluous and therefore has little, if any, probative value. <u>United States v. Boyd</u>, 55 F.3d 239, 246 (7th Cir. 1995). Similarly, suppressed impeachment evidence has little probative value if additional evidence strongly corroborates the witness's testimony the suppressed evidence might have impeached. <u>See</u> <u>Strickler</u>, 527 U.S. at 292-94.

*Skinner*

As noted above, the majority of this claim is directed at evidence that was purportedly suppressed by the government concerning Skinner. The defendants have suggested that this material consists of both impeachment and exculpatory evidence.

The background of this case is indeed unusual. This history leads the court to carefully consider this claim. The defendants have called Skinner "the star government witness" and indicated that the Tenth Circuit stated in its opinion affirming their convictions that "it was the testimony of Skinner that resulted in [their] convictions." The court believes the defendants have misread the Tenth Circuit's decision and misunderstood the evidence that was presented at trial. In considering Pickard's argument on appeal that this court erred in denying his motion for judgment of acquittal, the Tenth Circuit stated:

> After reviewing the record on appeal, we conclude, as did the district court in denying Pickard's motions, that the evidence of Pickard's guilt on both charges was overwhelming. Without recounting that evidence in detail, we note that the testimony of Skinner, combined with the substantial physical evidence, was more than ample to support the convictions. Although Pickard strenuously attacks the veracity of Skinner's testimony, the jury was clearly entitled to, and indeed did, find Skinner to be a credible witness. Moreover, as previously discussed, there was little, if any, evidence to support Pickard's own testimony, and the verdicts indicate that the jury reasonably rejected that testimony as incredible. Thus, we conclude the district court properly denied Pickard's motion for judgment of acquittal.

Apperson, 441 F.3d at 1209-1210.

The Tenth Circuit was only noting that Skinner's testimony, along with other evidence, supported the verdicts.   The Court further noted that the jury did find Skinner to be a credible witness.  Finally, the Court found that the verdict also indicated that the jury "reasonably rejected" Pickard's testimony as "incredible."   The Tenth Circuit made no observation that the charges against the defendants rose or fell upon the testimony of Skinner.   Thus, defendants' suggestion that the Tenth Circuit indicated that Skinner's testimony resulted in their convictions is fatuous.   This was not a case where the convictions were tied to the testimony of only one man.   Rather, the evidence offered by the government corroborated and supported the key testimony offered by Skinner.

The defendants have consistently overstated Skinner's importance to the verdicts in this case.   He was no doubt an important witness, but his significance lay in the fact that he initiated the investigation against the defendants.   He provided law enforcement with the opportunity to gain substantial information about the defendants prior to initiating the charges. The charges against the defendants were prompted when Skinner appeared with counsel, a former assistant United States attorney, at the Department of Justice and indicated that he was a part of a large conspiracy to manufacture LSD.  Skinner stated he was fearful for his life because the defendants had discussed the killing of an

13

individual after he provided information about the conspiracy.  The DEA had immediate concerns about Skinner because he had a past criminal history, was a past drug user, and was an admitted party to a large LSD operation.  Nevertheless, the DEA determined that the "potential benefit to [it] and the public interest outweighs the negative risks associated with [him]."  The DEA, however, was obviously concerned with Skinner's credibility and thus made considerable efforts during the course of the investigation to corroborate his information.  Skinner had come to the DEA while the conspiracy continued to exist.  Thus, the DEA was presented with the opportunity to corroborate Skinner's story and gain considerable information on the other conspirators, the defendants. The DEA did so through the use of audio and video recordings.  The DEA also conducted surveillance of some of the defendants' activities.   Documents and other materials were found that corroborated much of Skinner's information.  Finally, other witnesses were found to support Skinner's statements.  The ultimate result was that the evidence against the defendants was overwhelming.

The government was very cognizant of their obligations under Brady and Giglio concerning Skinner prior to trial.  It provided the court with Skinner's DEA confidential informant file (CI file) and his DEA risk assessment file(RA file) for in camera review.  In addition, the government provided a wealth of materials to the

defendants concerning Skinner.  It filed a motion in limine to restrict the use of some of these matters at trial.  In response, defendant Pickard noted a number of other impeachment matters that he would seek to introduce during the cross-examination of Skinner. The court granted the government's motion in part and denied it in part.  The court did not address the matters raised by Pickard and determined that they would be considered during the course of the trial.  The court ultimately considered most of these matters during the trial, and ultimately allowed the defendants to cross-examine Skinner on most of them.

The court reviewed the CI and RA files to determine if any additional <u>Brady</u> material was present.  The court found nothing other than what the government had provided to the defendants. Eventually, the court ordered the government to provide the RA file to the defendants and, contrary to the argument of the defendants raised in the instant motions, this file was provided to the defendants during trial.  The court has again reviewed the files and determined that no <u>Brady</u> materials were overlooked by the government.

In addition, the government, in an attempt to counter some of the arguments raised by the defendants concerning the suppression of evidence, voluntarily provided the court with the FBI files concerning Skinner for <u>in</u> <u>camera</u> review.  These files were provided only recently.  The records provide the following information

concerning the efforts of the government to obtain information from the FBI on the past informant activities of Skinner:

> In 2003, individuals identified as William Leonard Pickard and Clyde Apperson were prosecuted on drug related charges in the U.S. District of Kansas. At trial, an individual identified as Gordon Todd Skinner . . . testified on behalf of the government. During the course of the proceedings in this matter, AUSA Greg Hough requested [an FBI agent] determine whether Skinner had ever been used as an informant by the FBI. [The named FBI agent] in turn requested a records check be conducted by the informant coordinator for the FBI Kansas City Division Office. The check revealed no record of Skinner, however, due to a misunderstanding regarding the request, informant records were only checked for the Kansas City Division and not Bureau-wide.
> In February 2009, AUSA Hough made another request to determine whether Skinner had worked as an informant for the FBI. This request stemmed from information received by AUSA Hough that Skinner had been an FBI informant, possibly in San Antonio, Las Vegas, Phoenix, Denver, Miami, San Francisco, Albuquerque, Seattle, Kansas City, or Boston.

The FBI file reveals only that Skinner served as informant for the Oklahoma City FBI office. He was opened as an informant on June 8, 1984 and closed due to lack of production on June 4, 1985. The file further reveals that Skinner's actions as an informant during this period failed to provide "any information pertinent to law enforcement responsibilities."

Skinner was extensively cross-examined during the trial. The cross-examination lasted over four days. Was Skinner a liar? Was Skinner a cheat? Was Skinner a fraud? The evidence certainly indicated that the answer to those questions was yes, yes and yes. During the cross-examination, Skinner admitted, inter alia, that he

had (1) used a variety of drugs, both legal and illegal; (2) provided illegal drugs to others since the age of 15; (3) manufactured mescaline; (4) impersonated others on numerous occasions; (5) laundered money; (6) stolen property; (7) violated laws while on pretrial release; (8) previously served as an informant; (9) engaged in fraudulent activities; and (10) lied to others, including to the DEA in this case and to judges.  He admitted a willingness to lie to stay out of trouble and out of jail.  To say that Skinner's credibility was challenged would be a gross understatement.

The government acknowledged the problems with Skinner repeatedly in their arguments and in the evidence they offered. The government made that clear in their opening statement:

> The agents involved in this case knew then and know now that Mr. Skinner had considerable baggage and you'll hear about a ton of that.  Criminal arrests, criminal convictions.  He has criminal charges pending now in Wamego over the theft of some stereo speakers or alleged theft, been involved in civil lawsuits.  Lots of baggage, lots of words.  The evidence will show you that as they commenced their dealings with Mr. Skinner the agents knew that he was just the type of a guy that you would expect to be involved in a criminal enterprise, so that was no surprise.
>
> .    .    .    .    .
>
> Knowing Mr. Skinner's baggage, DEA agents went about great extremes in attempts to corroborate what Mr. Skinner was telling them.  You'll see and hear exactly how this was done.  And you'll see that the DEA did not blindly follow where Mr. Skinner led them, but instead they did everything that they could to back up what he said.
>
> .    .    .    .    .

17

During [Skinner's] testimony there will be a lot of peripheral matters, but his testimony about this LSD lab, we submit, will be corroborated by a whole bunch of other evidence in the form of witnesses' testimony and exhibits. The evidence will show you the case is not just about Mr. Skinner's testimony and you don't have to believe him alone. In fact, if Mr. Skinner tells you something that doesn't sound right and it's not independently corroborated, disregard it because that doesn't affect his testimony on the LSD, it will be solid. You'll see in spite of Mr. Skinner's warts that he'll tell you the truth about the LSD.

During closing argument, the government reiterated Skinner's past problems as well as the corroboration of his testimony:

As promised, Mr. Skinner told you about his many, many warts; drug use, criminal activities. But, you know, in spite of all of those warts, everything that Mr. Skinner has told you – if you look at the evidence, everything Skinner told you about these men, about their lab, about their LSD, is corroborated. You don't have to believe Skinner standing alone. The physical evidence, the testimony of the other witnesses, absolutely corroborate what Skinner says.

.     .     .     .     .

You don't have to like Gordon Todd Skinner. You don't have to like the things that he's done in his lifetime. In fact, I would encourage you not to like a lot of the things that Mr. Skinner has done in his lifetime.
    But recognize, ladies and gentlemen, you're not being asked to go on a hayrack ride with Gordon Todd Skinner, you're not being asked to believe what this man says in a vacuum. You're being asked to consider all of the evidence in this case.

.     .     .     .     .

    But remember as you consider the evidence, everything Mr. Skinner said has been corroborated. And if you find anything Skinner says about these Defendants, this LSD lab, this ET that is not corroborated, throw that portion of the testimony out.

The various arguments made by the government as well as the evidence offered at trial made Skinner's credibility problems

18

readily evident.  These problems were certainly well understood by the jury.

With this background, the court turns to the several issues that must be considered.  First, we must determine how much of the knowledge possessed by various agencies of the federal government should be imputed to the prosecution.  Courts have adopted various standards on when knowledge by an agency will be imputed to the prosecution.  <u>See</u> <u>Smith v. Secretary of New Mexico Dept. of Corrections</u>, 50 F.3d 801, 825 n. 36 (10th Cir.), <u>cert. denied</u>, 516 U.S. 905 (1995).  The Tenth Circuit has determined that the "prosecution" for <u>Brady</u> purposes includes "not only the prosecutors handling the case, but also extends to law enforcement personnel and governmental entities involved in investigative aspects of a particular criminal venture." <u>United States v. LaVallee</u>, 439 F.3d 670, 698 n. 19 (10th Cir. 2006) (citing <u>Smith</u>, 50 F.3d at 824).  In this case, the governmental entity that handled the investigation was the DEA.  Although other entities may have assisted in various facets of the investigation, the primary investigation was handled by the DEA.  Thus, the court agrees with the government that requests made to the DEA were sufficient to satisfy their obligations under <u>Brady</u> and <u>Giglio</u> concerning Skinner's status as a past confidential informant.  The court does not find that the government had any obligation to seek out any <u>Brady</u> or <u>Giglio</u> materials from the FBI on Skinner.  However, to the extent that the

19

government has now provided this information, the record fails to support the allegations made by the defendants in their motions.

Second, the court must note another unusual aspect of this case. During trial, after Skinner's testimony in the government's case, he began assisting the defendants. This surprising event must also be considered in addressing the instant motion. Skinner was available to the defendants during the trial and provided assistance to them. Skinner continued to assist the defendants following the completion of the trial. He has written letters to counsel for the defendants and provided additional information. Thus, the defendants' access to Skinner at trial allowed them to develop much of the information that they now claim was suppressed by the government. See, e.g., Spirko v. Mitchell, 368 F.3d 603, 611 (6th Cir. 2004) (no Brady violation despite failure to produce evidence of defendant's alleged accomplice's alibi because evidence was available to defense from other sources and defense was aware of essential facts necessary to obtain evidence), cert. denied, 544 U.S. 948 (2005).

The aforementioned discussion reveals the following concerning the defendants' contention that the government suppressed evidence of Skinner's criminal and informant activities: (1) Skinner was exhaustively cross-examined about a variety of matters that questioned his credibility; (2) the jury fully understood the issues concerning Skinner's credibility; (3) the government

20

presented substantial evidence corroborating the testimony provided
by Skinner; (4) the government produced overwhelming evidence of
the defendants' guilt; (5) the defendants had access to Skinner
during the trial which allowed them to obtain much of the
information that they now contend was suppressed; and (6) the
government provided the defendants with all relevant Brady/Gigio
material in the possession of the DEA prior to trial.   These
conclusions support a finding that the suppressed matters
concerning Skinner's criminal and informant activities are not
material.   There is no reasonable probability that the disclosure
of this material would have produced a different outcome.   Most of
the evidence noted by the defendants would simply have been
cumulative to the other evidence that was offered to impeach
Skinner's testimony.   The overwhelming evidence that was presented
also demonstrated that this evidence would not have produced
another result.   In sum, the court finds that the defendants
received a fair trial.

The court now turns to the other specific arguments made by
the defendants.   The court shall first examine the defendants'
contention that the government suppressed exculpatory evidence.
The defendants argue that the DEA suppressed reports of Skinner's
clandestine drug laboratory and trafficking during their trial.

The court has carefully examined the evidence offered by the
defendants in support of this claim.   They rely upon reports where

21

certain individuals provided information to the DEA in July 2003. In those reports, the sources of information suggested that Skinner had an MDMA and LSD laboratory in Tulsa, Oklahoma. They further indicated that he had been selling pills and marijuana in Arizona and Washington during 2002 and 2003. The government does not dispute that these reports exist. They argue only that the "DEA determined [the] information in this matter regarding Skinner [was] self-serving and not credible."

The court believes that this evidence would certainly have constituted impeachment evidence, but it in no way rises to the level of exculpatory evidence. Exculpatory evidence is defined as evidence that is material to the issue of guilt or innocence. Bagley, 473 U.S. at 676. The defendants were charged with conspiracy to manufacture, distribute and dispense LSD for the period from August 1999 through November 6, 2000. The court is at a loss how Skinner's manufacture and sale of MDMA or marijuana or LSD during 2002 and 2003 could have exculpated the defendants from the charges they were facing.

The court does believe that this information should have been provided to defense counsel. The prosecution's Brady obligation continues throughout the trial and even after the verdict is rendered. Leka v. Portuondo, 257 F.3d 89, 103 (2nd Cir. 2001); see also Imbler v. Pachtman, 424 U.S. 409, 427 n. 25 (1976). However, as noted above, the court is ultimately not persuaded that this

information was material, particularly in light of the other impeachment evidence that was presented.

The defendants have repeatedly suggested that the government suppressed evidence that Skinner was permitted to retain over $1,000,000 in laundered funds and assets in violation of federal law.  They suggest this fact makes this case similar to <u>Bagley</u> where the government suppressed information that an informant was paid $300 for his testimony.

Frankly, this argument is simply frivolous.  The evidence offered by the defendants to support this claim consists of materials provided by the government to them prior to trial.  Thus, any suggestion that the government "suppressed" this information is wholly without merit.  The defendants were well aware that this issue existed prior to trial and could have raised it at any time, but failed to do so.

The defendants have also argued that the government suppressed information of an ongoing relationship between the government and Skinner prior to trial.  This "ongoing" relationship was the subject of extensive cross-examination of Skinner and DEA agent Nichols by Pickard's counsel.  The court fails to find any support for any improper relationship that existed between Skinner and the government that was "suppressed" by the government.

Finally, the defendants have suggested that the government suppressed information that Skinner was deactivated and blacklisted

as a confidential informant by various agencies.  Again, the court finds inadequate support for this suggestion.

Even if we found support for any of the aforementioned contentions, we would conclude that the suppressed matters were not material.  We reach this decision for a variety of reasons, but primarily because the evidence noted by the defendants is essentially impeachment evidence, and the evidence presented against the defendants at trial was overwhelming.  The suppressed evidence would have added little to the jury's view of Skinner. The jury fully understood the issues concerning Skinner's credibility.  The alleged suppressed evidence would not have resulted in the reasonable probability of a different outcome at trial and does not undermine the confidence of the court in the verdict.  Thus, we find that the defendants' <u>Brady</u>/<u>Giglio</u> claim concerning Skinner lacks materiality and must be denied.

*Savinelli and Guinan*

The defendants have also suggested that the government suppressed investigative records and prior convictions of witnesses Savinelli and Guinan.  The government has responded that it provided the NCIC criminal records of both of these witnesses.

The defendants have acknowledged they have no information concerning any evidence withheld by the government on Savinelli. They have only suggested they will supplement this contention at a later date.  The defendants have offered no supplementation.

24

The court has reviewed the exhibits filed by the defendants in support of their contention that the government suppressed investigative reports and prior convictions of Guinan. The exhibits filed by the defendants fail to support their contention. They fail to demonstrate that the government or the DEA had access to any Brady material concerning Guinan and failed to provide it to defense counsel. The first exhibit is a DEA report with a reference to Guinan and a NADDIS number. The second report is a record from the Oklahoma Bureau of Investigation showing Guinan's arrest for possession of dangerous drugs in 1994. The final exhibit is a document from the District Court in and for Tulsa County, Oklahoma showing two misdemeanor convictions for Guinan for unlawful possession of marijuana in 1996. The exhibits filed by the defendants fail to support their contention. They fail to demonstrate that the government or the DEA had access to any Brady material concerning Guinan and failed to provide it to defense counsel. "While Brady requires the government to tender the defense all exculpatory evidence in its possession, it establishes no obligation on the government to seek out such evidence." United States v. Walker, 559 F.2d 365, 373 (5th Cir. 1977); see also United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975) ("But Brady clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess."), cert. denied, 425 U.S. 905 (1976); United States v. Atkinson, 512

F.2d 1235, 1239 (4th Cir. 1975) (government prosecutor has no duty to disclose information to the defense as to the criminal background of a prosecution witness where it is not even charged that government attorneys were in possession of the information). The court is persuaded here that the disclosure of Guinan's NCIC record fully complied with <u>Brady</u> concerning the requirements of his criminal history.  <u>United States v. Luis-Gonzalez</u>, 719 F.2d 1539, 1548-49 (11th Cir. 1983).

Speedy Trial Act

Defendants argue that their rights to a speedy trial under the Speedy Trial Act(STA) were violated.  The defendants assert various reasons why the district court and Tenth Circuit on appeal erred in determining that their rights under the STA had not been violated. Specifically, defendants suggest that the delays caused by continuances requested by the government on March 23, 2001 and April 26, 2001 should not have been excludable under the STA.

The Tenth Circuit thoroughly considered the defendants' arguments on appeal concerning the Speedy Trial Act.  <u>See</u> <u>Apperson</u>, 441 F.3d at 1177-84.  The arguments raised here appear to be nothing more than a rehash of the contentions raised on direct appeal.

This argument must be rejected for two reasons.  First, this issue was decided on appeal.  As specifically noted by the Tenth Circuit:  "It is beyond dispute that all of the time from December

12, 2000, through at least November 5, 2001, was excludable."
Apperson, 441 F.3d at 1182.  A § 2255 motion cannot be used to
relitigate issues raised and addressed on direct appeal, absent an
intervening change of law.  United States v. Warner, 23 F.3d 287,
291 (10th Cir. 1994).  Petitioners have failed to note any
intervening change of law.  Second, petitioners do not claim that
the alleged violation of the STA rises to the level of a
constitutional violation.  A claim of legal error, as opposed to
constitutional or jurisdictional error, is not cognizable in
section 2255 proceedings unless the error constitutes a fundamental
defect in the trial resulting in a complete miscarriage of justice.
United States v. Addonizio, 442 U.S. 178, 185 (1979).  A violation
of the STA, even if present (a proposition for which the court
finds no support), would not serve as grounds for granting
petitioners' motion.  Again, there is no evidence that petitioners
were prejudiced by the delay between the day they were indicted and
the day they were tried.

Fourth Amendment

     Pickard contends that his Fourth Amendment rights were
violated when the missile base premises were searched without a
search warrant.  He argues that this issue was "only partially
addressed" in his direct appeal.  He suggests that it was not fully
and fairly litigated on appeal.  He asserts that the Tenth Circuit
incorrectly concluded that there was no evidence suggesting that he

"stayed at the site or otherwise had some sort of possessory interest in the site."

Fourth Amendment violations are not reviewable in a § 2255 motion when the federal prisoner has had a full and fair opportunity to litigate the Fourth Amendment claim at trial and present issues on direct appeal. <u>United States v. Cook</u>, 997 F.2d 1312, 1317 (10th Cir. 1993). A review of the record and the opinion issued by the Tenth Circuit denying Pickard's direct appeal clearly demonstrates that Pickard did have a full and fair opportunity to litigate this issue at trial and on appeal. <u>See</u> <u>Apperson</u>, 441 F.3d at 1185-87. Consequently, this court cannot review this Fourth Amendment claim.

Confrontation Clause

Pickard contends that the district court violated his right to confront witnesses when it granted the government's motion <u>in limine</u> concerning certain matters involving Skinner's background. Pickard suggests that the court's ruling would have been different if the court had been aware of the many matters involving Skinner's past that have been discovered since the trial. He further asserts that his motion <u>in</u> <u>limine</u> argument was not fully and fairly litigated on direct appeal because of the page limitations imposed by the Tenth Circuit.

Once again, this issue is barred from review because it was raised and addressed on direct appeal. There has been no

intervening change in the law on the issues raised by the government's motion <u>in</u> <u>limine</u> and there has been no newly discovered evidence offered by Pickard on these matters. The "new" matters noted by Pickard in other claims involve other activities by Skinner, not those that the court considered in the motion <u>in</u> <u>limine</u>. The court is not persuaded that knowledge of the other matters noted by Pickard would have influenced the court's decision on the specific matters raised in the government's motion <u>in</u> <u>limine</u>. In fact, it is quite apparent to the court that many of the matters noted by Pickard concerning Skinner's background that the court was unaware of at the time of trial would have been subject to the same rulings that the court made in ruling on the government's motion <u>in</u> <u>limine</u>.

The suggestion that this issue was not fully considered on appeal is ludicrous. This is another issue that was exhaustively discussed and considered by the Tenth Circuit. <u>See</u> <u>Apperson</u>, 441 F.3d at 1194-97. Pickard has been unable to specifically demonstrate how the page limitations imposed by the Tenth Circuit precluded his ability to fairly address this issue on appeal.

Accordingly, the court finds this claim barred from review for the aforementioned reasons. To the extent that Pickard raises any issue that was not raised and addressed on direct appeal, the court finds that it lacks merit.

Refusal to Allow Certain Witnesses to Testify and Refusal to Grant Immunity to Certain Witnesses

Pickard contends that his rights to due process and compulsory process were violated when this court refused to allow certain witnesses to testify and the government refused to grant immunity to certain witnesses. Pickard asserts that these rulings must be revisited because the government suppressed certain relevant evidence concerning these witnesses.

Once again, this is another issue that was raised and decided on direct appeal. The Tenth Circuit thoroughly addressed each of the matters noted by Pickard in the instant § 2255 motion. See Apperson, 441 F.3d at 1201-04. Pickard has failed to offer any evidence in support of his contention that the government suppressed materials relevant to these issues. Accordingly, we must once again conclude that this claim is barred from review.

Alteration of Exhibits

Pickard argues that his due process rights were violated when the government altered an exhibit produced at trial. Pickard points specifically to Exhibit No. 196, a computer printout of his laptop computer address book. Pickard suggests that the government "knew or should have known [the DEA agent's] testimony regarding missing DEA contacts was false." He further asserts he can demonstrate that the file alteration was a "protracted and purposeful effort." Pickard requests discovery because "the issue of misconduct becomes heightened when placed in the context of broad government suppression of other records discussed [in his

30

Brady/Giglio claims].

This is another issue that was extensively examined on direct appeal.  See Apperson, 441 F.3d at 1207-08.  Pickard has failed to articulate any intervening change of law or newly discovered evidence.  He suggests that the government was aware of the alteration, but he again fails to provide any evidence in support of that contention.  He has also failed to show good cause for discovery on this issue.  Finally, the comments of the Tenth Circuit on direct appeal are equally applicable here: "[Defendants do not] assert, let alone offer any explanation of how, this incident would have adversely impacted the jury's decision-making." Id. at 1208.  In sum, the court must conclude that it is barred from review of this claim.  To the extent that Pickard raises any issue that was not raised and addressed on direct appeal, the court finds that it lacks merit.

Insufficient Evidence

The defendants contend, based upon the newly discovered evidence, that the evidence in support of their convictions was insufficient.  The newly discovered evidence consists of (1) evidence that Skinner was manufacturing LSD; and (2) the "plethora of suppressed records" that impeach Skinner's credibility.

To justify a new trial based on newly discovered evidence, "the alleged newly discovered evidence [must] be (1) more than impeaching or cumulative, (2) material to the issues involved, (3)

31

such that it would probably produce an acquittal, and (4) such that it could not have been discovered with reasonable diligence and produced at trial." <u>United States v. Trujillo</u>, 136 F.3d 1388, 1394 (10th Cir.), <u>cert. denied</u>, 525 U.S. 833 (1998).

As this court and the Tenth Circuit have stated repeatedly in this case, the evidence in support of the defendants' conviction was overwhelming.  The "newly discovered evidence" noted by the defendants would not "probably produce an acquittal."  The fact that Skinner was manufacturing LSD at some point either during the trial of this case or thereafter does not mean that the defendants were not involved in the charges of this case.  As succinctly noted by the government in their response to the defendants' 2255 motion: "[T]he evidence of [the defendants'] joint possession of the lab, ET and LSD on November 6, 2000, along with their attempts to flee arrest, with nothing more, are (sic) enough to convict them of these charges."  Moreover, as noted in the discussion on the defendants' <u>Brady</u>/<u>Giglio</u> claim, the "newly discovered evidence" of impeachment matters concerning Skinner's credibility is also insufficient to produce an acquittal of the defendants.  The court has noted that these matters, in light of the substantial evidence that demonstrated Skinner's credibility was questionable, are simply not material here.  In sum, the court finds no merit to this argument.

Sentencing Issues

A.

Pickard contends, based upon a recent Supreme Court decision, that his sentence was illegal.   Pickard suggests the Supreme Court's decision in Lopez v. Gonzales, 549 U.S. 47 (2006) precludes the use of his 1978 California conviction for attempted manufacture of MDA as an underlying offense for mandatory minimum purposes.   He argues that Lopez excludes the 1978 conviction because (1) there is no federal parallel in the Controlled Substances Act(CSA) for "attempt" to manufacture; and (2) he was not convicted by trial of this offense but pled nolo contendere.

Pickard has not elaborated on either of these arguments.   He has not pointed the court to any language in Lopez or any other case that supports either argument.   The court fails to find any support for them.

In Lopez, the Supreme Court held that state drug felonies classified as misdemeanors under the CSA do not qualify as aggravated felonies under the portion of the Immigration and Nationality Act(INA) that requires deportation of any alien who has been convicted of an aggravated felony.   Lopez, 549 U.S. at 60. The decision in Lopez has no application here.   Pickard was sentenced under the CSA, not the INA.   The CSA contains discrete definitions that differ from the language of the INA.   These differences render Lopez inapplicable here.   See United States v. Winningham, 2007 WL 1308673 at *2 (N.D.Fla. 2007) (Lopez was

33

inapplicable to the language "prior conviction for a felony drug offense" in 21 U.S.C. § 841(b)(1)(A) because "felony drug offense" was defined in 21 U.S.C. § 802(44) as "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State"); <u>Lampton v. Menifee</u>, 2007 WL 2710798 at *4 (W.D.La. 2007) ("Further, since the resolution of petitioner's predicament does not turn on an interpretation of the 'aggravated felony' provisions of the INA, the holding of <u>Lopez</u>, <u>supra</u>, does not apply."); <u>Maxwell v. Warden</u>, 2007 WL 546366 at *3 (N.D.Ohio 2007) (<u>Lopez</u> did not apply to CSA crimes outside of the INA context).

The court also finds no support in <u>Lopez</u> or elsewhere for the proposition that his 1978 nolo contendere plea in California cannot be considered a prior conviction for sentence enhancement purposes under 21 U.S.C. § 841.  <u>See</u> <u>United States v. Mejias</u>, 47 F.3d 401, 404 (11th Cir. 1995) (plea of nolo contendere constitutes a conviction for purposes of § 841); <u>see</u> <u>also</u> <u>United States v. Wright</u>, 238 F.3d 418, 2000 WL 1846340 at *5 (4th Cir. 2000) (same).

### B.

Pickard next argues that a recent decision of the Ninth Circuit, <u>United States v. Nguyen</u>, 465 F.3d 1128 (9th Cir. 2006), demonstrates that his 1978 nolo contendere plea in California cannot be considered a prior conviction for sentence enhancement purposes under 21 U.S.C. § 841.  This argument borders on being

frivolous.

In Nguyen, the government sought to prove the defendant's commission of one or more crimes by admitting the convictions from proceedings in which he had pleaded nolo contendere. Nguyen, 465 F.3d at 1130. The Ninth Circuit held that Fed.R.Evid. 410 prohibited the government from admitting the convictions just as it barred the admission of the pleas themselves. Id. at 1131. Here, the government did not present Pickard's nolo contendere plea at trial to prove his commission of a prior criminal offense. Rather, the court used the plea in determining Pickard's sentence under 21 U.S.C. § 841. The use of the prior conviction in this fashion did not violate the Federal Rules of Evidence and was entirely consistent with the definition of a prior conviction under § 841. Accordingly, we find no merit to this contention.

C.

Pickard contends that his sentence should be vacated based upon recent amendments to the United States Sentencing Guidelines. He argues that the recent amendments to guidelines reducing the offense levels for crack cocaine should be applied here because the amendments were made in part based upon racial disparity. He asserts that an "even higher percentage of Caucasians are sentenced for LSD than are Blacks for crack cocaine."

This convoluted argument is clearly without merit for a number of reasons, but primarily because the defendant was not sentenced

under the guidelines.  Rather, as pointed out to him by this court and the Tenth Circuit, he was sentenced under the mandatory minimum provisions of 21 U.S.C. § 841(b)(1)(A).  Accordingly, any amendments to the guidelines have no impact on Pickard's sentence.

D.

Finally, Pickard contends that the court's sentence is illegal because the court failed to consider the suppressed <u>Brady</u>/<u>Giglio</u> material in determining the appropriate sentence under 18 U.S.C. § 3553(a).  Once again, this argument merits little consideration for several reasons, but foremost is the fact that the defendant was not sentenced under the guidelines.  As stated previously, the court sentenced the defendant under the mandatory minimum provisions of 21 U.S.C. § 841(b)(1)(A), not the sentencing factors set forth in 18 U.S.C. § 3553(a).  Accordingly, the court also finds no merit to this argument.

Severance

Apperson contends that his Fifth and Sixth Amendment rights under the Constitution were violated when this court denied his motion for severance.  The defendant raises essentially the same arguments that were raised at trial.

This issue was thoroughly considered at trial and on appeal. <u>See</u> <u>Apperson</u>, 441 F.3d at 1190-91.  The court finds that it is barred from review of this claim.  To the extent that the defendant raises anything new, the court finds no merit in any of these

issues.

Sentencing Issues

Apperson contends that the court erred in enhancing his sentence under U.S.S.G. § 3B1.1(c) and denying his request for a role reduction under U.S.S.G. § 3B1.2(b). This claim is apparently premised on the contention that the alleged suppressed <u>Brady</u>/<u>Giglio</u> information would have made a difference to the jury and the court.

The court finds no merit to this argument. Apperson has failed to explain how the aforementioned <u>Brady</u>/<u>Giglio</u> information would have impacted the sentencing issues in this case. The evidence in support of the court's decision on the enhancement of Apperson's sentence was "amply supported" by the evidence at trial. <u>See</u> <u>Apperson</u>, 441 F.3d at 1211. The court does not believe that the <u>Brady</u>/<u>Giglio</u> matters, even if they were suppressed by the government, would have changed Apperson's sentence. Accordingly, this claim shall also be rejected.

**MOTION FOR DISCOVERY**

In this motion, defendants seek discovery in support of their motions to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. The defendants seek various materials to support their claims that the government (1) violated its <u>Brady</u>/<u>Giglio</u> obligations by suppressing the criminal and informant backgrounds of witness Gordon Todd Skinner as well as other witnesses; and (2) engaged in prosecutorial misconduct by failing to disclose

37

exculpatory evidence.  The defendants claim that they have produced facts showing the following:

> 1) The government suppressed material evidence from 1984–2003 on Skinner and other government witnesses in the instant case and - with regard to Skinner - in other suppressed trials;
>
> 2) The government's narratives in the instant case and other suppressed trials demonstrate a pattern and practice of knowingly complying with Skinner's continuing criminal activity while an informant, and permitting Skinner's perjury and that of government agents at trials.

Based upon that alleged factual record, the defendants essentially seek the following concerning Skinner:  (1) DEA Narcotics and Dangerous Drugs Information System (NADDIS) index or display record; (2) access or inquiry logs for NADDIS through the present date; (3) corresponding indices from FBI, Customs and IRS; (4) access logs from FBI, Customs and IRS; (5) the indices associated reports and records during the period of involvement in the events described in this claim; and (6) confidential informant records as well as records showing a source of information, cooperating witness or other relationship to a federal agency during the events in this claim.  They also seek the following information concerning the witnesses Alfred Savinelli and Gunnar Guinan:  past criminal and investigative histories.  Finally, they have produced several pages of interrogatories and requests for admission.

The government has responded that the defendants:  (1) have

38

not demonstrated that the evidence sought is material because it would constitute cumulative impeachment, not substantially impeaching material; and (2) have not made a prima facie showing of a right to discovery under Rule 6(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts.   The government further argues that the matters concerning Skinner are not admissible under Fed.R.Evid. 608, 609 and 403.

A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course. Bracy v. Gramley, 520 U.S. 899, 904 (1997). The rules governing proceedings under 28 U.S.C. § 2255 provide that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."  Rule 6(a) of the Rules Governing Section 2255 Proceedings for the U.S. Dist. Cts.   In order to show "good cause" under Rule 6(a), a petitioner must provide the court with "specific allegations [that] show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." Bracy, 520 U.S. at 908-909. "Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review." Strickler, 527 U.S. at 286.

Having considered all of the materials provided to the court,

the court is not persuaded that the defendants have demonstrated that they are entitled to the discovery they have sought.  The court does not believe that the defendants have shown good cause for the discovery of these materials, in light of the aforementioned discussion on their <u>Brady</u>/<u>Giglio</u> claim.  Petitioners have not shown that, if the facts are fully developed on their claims, they may be able to demonstrate they are entitled to relief.  They, therefore, have not shown good cause for discovery.  <u>See</u> <u>Bracy</u>, 520 U.S. at 908-09; <u>Wallace v. Ward</u>, 191 F.3d 1235, 1245 (10th Cir. 1999), <u>cert. denied</u>, 530 U.S. 1216 (2000).  Accordingly, this motion is denied.

**MOTION FOR PRODUCTION OF OCDETF PROPOSAL**

In connection with their <u>Brady</u>/<u>Giglio</u> claim, defendants seek an order requiring the government to produce the Organized Crime Drug Enforcement Task Force(OCDETF) proposal for this case for <u>in camera</u> inspection.  They further seek an order requiring the government to identify the agencies other than the DEA that participated in this OCDETF investigation.  They contend they need this information in order to pursue their § 2255 motions.

As noted in the aforementioned discussion, the court continues to believe that the DEA was the agency responsible for handling this case.  The DEA investigated this case from the outset.  Karl Nichols, a special agent with the DEA, interviewed Skinner after his contacts with the Department of Justice and continued to head

40

the investigation from that point to the conclusion of the case.
He served as the case agent at trial.   A "risk assessment" of
Skinner was prepared by the DEA.   Prior to trial, the court
reviewed <u>in</u> <u>camera</u> the confidential informant file of Skinner
possessed by the DEA.   The testimony provided at trial failed to
demonstrate any significant involvement by the FBI or any other
agency in the investigation of this case.   The defendants have
failed to point to any evidence showing any involvement by other
agencies in the investigation of this case.   Under these
circumstances, the court sees no reason to examine the OCDETF
proposal in this case, even if one exists.   Accordingly, this
motion shall be denied.

**MOTION FOR ENLARGEMENT OF TIME/DELAY RULING TO CONDUCT DISCOVERY**

The defendants seek an enlargement of time and a delay in the
court's ruling on their motion for leave to conduct discovery.
They seek this extension so they can obtain the FBI's response to
their pending Freedom of Information Act requests.

For the reasons stated previously, the court finds no reason
to delay a ruling on the pending motions.   The court has not been
persuaded that any materials from the FBI will have an impact on
the defendants' motion for discovery or their § 2255 motions.
Moreover, the government, in an effort to address this issue, has
voluntarily produced the FBI file for <u>in</u> <u>camera</u> review by the
court.   The court believes that the government produced all of the

41

Brady/Giglio materials that the DEA and FBI possessed concerning Skinner. To the extent that any materials were overlooked, the court does not believe that these materials could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Accordingly, this motion shall be denied.

**MOTION TO AMEND/CORRECT RECORD**

The defendants, relying upon Banks v. Dretke, 540 U.S. 668 (2004), seek an order requiring the government to amend and/or correct the record in this case. The defendants suggest that Banks requires the government to "set the record straight" concerning Skinner's criminal and informant activities. The defendants ask the court to order the government to produce the suppressed documents and thus correct the record relating to the "contents of the Court's sealed files."

In Banks, the defendant was convicted of capital murder. He eventually sought relief under 28 U.S.C. § 2254. During the federal habeas corpus proceeding, discovery revealed that the state prosecutor had withheld evidence that would have allowed the defendant to discredit two essential prosecution witnesses. Banks, 540 U.S. at 675. The prosecution had not disclosed that one of the witnesses (1) was a paid police informant; and (2) had testified untruthfully concerning when he provided statements to the police. The prosecution also had not disclosed that it had "intensively

42

coached" another witness.  The prosecution allowed this witness to testify untruthfully that his testimony was entirely unrehearsed. The Supreme Court found that the actions of the prosecution violated Brady.  Id. at 703.  The Court, after considering the evidence in the case, determined that there was a reasonable probability of a different result had the suppressed information been disclosed to the defense.  Id.  In reaching this conclusion, the Court stated:  "When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight."  Id. at 675-76.  The Court further commented:  "A rule declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." Id. at 696.

The court is not persuaded that Banks requires any action by the government in this case for a variety of reasons.  First, the defendants have failed to point to any untruthful information that was offered by the government during the trial.  Second, the defendants have failed to show that the government suppressed information that it was aware of prior to trial, at trial or after trial.  The defendants have pointed to various criminal activities and informant activities involving Skinner, but the defendants have failed to show that any of this information was in the hands of the DEA or the prosecutor.  The defendants have noted that most of this

43

information involved associations between Skinner and the FBI, which the court has determined that the government was not responsible to provide to the defendants.  In addition, this case is readily distinguishable from the circumstances in Banks.  There, the testimony of the informants was critical to the defendant's conviction.  The prosecution had no evidence to corroborate the testimony of these witnesses.  Here, however, the government presented considerable testimony to corroborate Skinner's testimony.  As noted below, the defendants simply cannot demonstrate that the alleged suppressed impeachment evidence noted by the defendants is sufficient to show a reasonable probability of a different result.  Accordingly, this motion shall be denied.

**MOTION REGARDING UNCONTESTED MOTIONS**

The defendants contend that the court should decide the following motions because the government has not timely responded to them:  (1) to amend/correct record in accord with Banks v. Dretke; (2) for enlargement of time and delay; and (3) to produce OCDETF Proposals.  The government initially responds that the motions, including the motion regarding uncontested motions, should be denied because the court has not decided defendants' motion for leave to conduct discovery.

The court agrees with the government.  The court did not address the motions or require a response from the government because of the pending motion for leave to conduct discovery.

44

Given the court's determination of the motion for leave to conduct discovery, as well as these other motions, the court shall deny this motion as moot.

**IT IS THEREFORE ORDERED** that defendant Pickard's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (Doc. # 554) be hereby denied.

**IT IS FURTHER ORDERED** that defendant Apperson's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (Doc. # 555) be hereby denied.

**IT IS FURTHER ORDERED** that defendants' motion for leave to conduct discovery (Doc. # 586) be hereby denied.

**IT IS FURTHER ORDERED** that defendants' motion to amend and correct record (Doc. # 589) be hereby denied.

**IT IS FURTHER ORDERED** that defendants' motion for enlargement of time to delay ruling to conduct discovery (Doc. # 594) be hereby denied.

**IT IS FURTHER ORDERED** that defendants' motion to produce OCDETF proposal (Doc. # 595) be hereby denied.

**IT IS FURTHER ORDERED** that defendants' motion for ruling on uncontested motions (Doc. # 598) be hereby denied as moot.

**IT IS SO ORDERED.**

Dated this 6th day of April, 2009 at Topeka, Kansas.

s/Richard D. Rogers
United States District Judge

45